UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY KAROL, | |
| Plaintiff, | |
| -against- | **FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND** |
| CITY OF NEW YORK, KENNETH K. WONG, Badge No. 8 EDUARDO CAUTELA, Badge No. 2903, ROBERT P. CANONICA, Badge No. 195, and MICHAEL J. GILLEN, Badge No. 905, | |
| Defendants. | |

Plaintiff Stanley Karol, by and through his attorneys, Emery Celli Brinckerhoff & Abady LLP, for his First Amended Complaint alleges as follows:

## INTRODUCTION

1.    This case arises from unconstitutional enforcement action by the City of New York against everyday New Yorkers who share their homes on Airbnb.  The City, acting through Mayor de Blasio's Office of Special Enforcement, is unlawfully targeting hosts who speak out in support of home-sharing and issuing baseless citations motivated by animus against the home-sharing platform Airbnb and the New Yorkers who use it.

2.    Plaintiff Stanley "Skip" Karol has lived in the same two-family home in Sunset Park, Brooklyn, for the last fifty-seven of his fifty-eight years.  The home was purchased by his parents in 1960; now that both of his parents have passed, Mr. Karol is the home's sole owner and occupant.

3.    Mr. Karol is disabled.  To supplement his very limited disability payments, he rents out rooms in his home through the online home-sharing platform provided by

Airbnb.  The income from these rentals is what keeps Skip Karol in his home: without it, he would be unable to cover the mortgage, utility costs, taxes, and many other expenses associated with home ownership in New York City.

4.      Mayor Bill de Blasio and his administration, backed by the big hotel industry and the union that represents hotel workers, oppose Airbnb with the claim that it promotes the creation of "illegal hotels" that "take affordable homes off the market."  To address this "problem," the Mayor's Office of Special Enforcement ("OSE"), a multi-agency office that was created in 2006 to address citywide quality of life issues like lawless clubs, adult establishments, and counterfeiting bazaars, has now been charged with focusing nearly exclusively on targeted enforcement against short-term housing rentals.

5.      In undertaking short-term rental enforcement, OSE was supposed to target commercial operators who take multiple-dwelling units off the rental market and rent them out through Airbnb on a consistent basis.  City officials have said repeatedly that their enforcement focus was on these "illegal hotels."  Mayor de Blasio has said that the City's focus on short-term rentals "[is] not with the vision of going after every homeowner who occasionally participates with Airbnb."  Mayor de Blasio also has said that the City was not concerned about individual homeowners who "just rent out a room once in a while," and that the City was not "going after every homeowner who occasionally participates with Airbnb."  Numerous other City officials have made similar statements.

6.      These promises have proven hollow.  OSE is now targeting its enforcement at individuals sharing their one- and two-family homes.  Indeed, at a June 26, 2018 City Council hearing, OSE publicly stated that it sees effectively no difference in the rules governing Airbnb hosts who rent out apartments in multi-family dwellings and those governing

Airbnb hosts home-sharing in one- or two-family homes.  In connection with these enforcement efforts, OSE coordinates with the powerful hotel lobby, which provides investigative and logistical support, including by sending private investigators to compile dossiers on Airbnb hosts and turn those dossiers over to OSE.

7.      This enforcement offensive now ensnares everyday New Yorkers who seek to earn extra money to help make ends meet—people like Skip Karol.  These people and their Airbnb guests face frightening incursions by City enforcement officers, followed by costly and questionable legal proceedings.  This offensive stands in sharp contrast to the previous articulations of the City's home-sharing enforcement policy.

8.      Most recently, the City Council has proposed legislation requiring the disclosure of Airbnb host information to OSE to bolster its enforcement efforts.  In particular, the legislation would require Airbnb to disclose the private information of its hosts—regardless of whether they are commercial operators or individual homeowners—to OSE for use in its enforcement offensive.

9.      The City's policy toward Airbnb, OSE's enforcement strategy, and the proposed forced disclosure legislation all amount to a direct challenge to Skip Karol's ability to stay in his home.  As a result, he decided to speak out against these measures, including at a public hearing on proposed legislation about home-sharing platforms like Airbnb held on June 26, 2018.  At the hearing, Mr. Karol complained that OSE placed him in the "same category" as Airbnb hosts who "own 100 apartments"; he described a frightening 2017 incident in which his modest two-family residence was blanketed with OSE tickets; and he stated his opposition to proposed legislation requiring Airbnb to report private information about hosts to the OSE.

10.    This was classic First-Amendment-protected political speech and petitioning activity—and the response from the City, via OSE, was swift and vicious.  A week after Skip Karol appeared at the Council hearing to criticize the de Blasio administration and the proposed anti-Airbnb legislation, OSE enforcement officers descended on his Sunset Park home and issued four (baseless) summonses which in total demand payment of up to $32,000 in fines.  Skip Karol doesn't have the money to fight these tickets – much less the money to pay the exorbitant fines if the summonses are ultimately sustained.  If nothing is done, Mr. Karol faces the prospect of losing his home for having criticized government policy.  Put another way, Skip Karol will be the victim of an "affordability crisis" created by the Mayor's own misguided policy and retaliatory actions.

11.    This is a case about unlawful retaliation against citizen speech, and the arbitrary application of government power.  Circumstances strongly suggest that the Mayor's OSE, apparently acting in concert with and for the interests of its hotel industry allies, targeted Mr. Karol's modest two-family home in Brooklyn for inspection and enforcement, from the approximately 40,000 Airbnb hosts operating in the City of New York, simply and solely to punish him for speaking out.

12.    This civil rights action seeks to vindicate Mr. Karol's rights under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

## THE PARTIES

13.    Plaintiff Stanley Karol is a citizen of the United States and at all relevant times hereto was a resident of Brooklyn, New York.

14.    Defendant City of New York is a municipality organized and existing under the laws of the State of New York.  At all relevant times hereto, the City, acting through

OSE, was responsible for the policy, practice, supervision, implementation, and conduct of all

OSE matters, including the appointment, training, supervision, and conduct of all OSE

personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of

the OSE, directing OSE enforcement efforts, and ensuring that OSE personnel obey the laws of

the United States and the State of New York.

       15.    Defendant Kenneth K. Wong, Badge No. 8, was at all relevant times an

Associate Fire Protection Inspector with the Fire Department of New York. At all relevant

times, Defendant Wong was an employee of the City of New York responsible for inspecting

residential units in connection with OSE investigations, and acted within the scope of his

employment when performing this function.

       16.    Defendant Eduardo Cautela, Badge No. 2903, was at all relevant times a

Construction Inspector with the New York City Department of Buildings. At all relevant times,

Defendant Cautela was an employee of the City of New York responsible for inspecting

residential units in connection with OSE investigations, and acted within the scope of his

employment when performing this function.

       17.    Defendant Robert P. Canonica, Badge No. 195, was at all relevant times a

Deputy Sheriff with the New York City Sheriff's Office. At all relevant times, Defendant

Canonica was an employee of the City of New York responsible for inspecting residential units

in connection with OSE investigations, and acted within the scope of his employment when

performing this function.

       18.    Defendant Michael J. Gillen, Badge No. 905, was at all relevant times a

Fraud Investigator with the New York City Sheriff's Office. At all relevant times, Defendant

Gillen was an employee of the City of New York responsible for inspecting residential units in

5

connection with OSE investigations, and acted within the scope of his employment when performing this function.

19.     Defendants Wong, Cautela, Canonica, and Gillen are referred to collectively as the "Individual Defendants."

### JURISDICTION AND VENUE

20.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York state common law.

21.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

22.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) as defendant City of New York resides in this district.

### JURY DEMAND

23.     Plaintiff demands trial by jury in this action.

### FACTUAL ALLEGATIONS

24.     Plaintiff Stanley Karol is a fifty-eight-year-old man who lives in the Sunset Park neighborhood of Brooklyn.  In 1963, Mr. Karol's parents purchased the home where he lives today.  Mr. Karol has lived in the home ever since.

25.     The home is zoned for two families; it has two floors and a basement that was finished in the 1980s.  The second floor of the home has four bedrooms and one bathroom, while the first floor has a living room, dining room, bathroom, and kitchen.  The basement has a kitchen, a bathroom, and one large general-purpose room.

26.     For some years prior to his becoming acquainted with Airbnb, Mr. Karol rented out one of the bedrooms on his second floor of his home to a monthly tenant.  The tenant

received housing assistance from the City, and so a City inspector visited the home to certify its

compliance with housing regulations.  It complied—and Mr. Karol never received a summons or

a complaint about the rental of the bedroom on the home's second floor room during the entire

period it was rented out to a monthly tenant.

***Mr. Karol Begins Listing Rooms in His Home on Airbnb***

27.    Mr. Karol was employed through 2010.  He then became disabled and was

unable to work.

28.    Mr. Karol's only regular income is modest monthly disability payments,

which are insufficient to pay the mortgage and other monthly expenses on the Sunset Park home.

29.    Mr. Karol's home is large, and he is the only person living there, as both

of his parents have passed away, and his siblings no longer live there.

30.    In or about 2013, Mr. Karol learned of Airbnb and the possibility of

having short-term guests pay him to stay in part of his home as he continued to live there.

31.    Airbnb appealed to him because it could provide a way for him to generate

additional income to cover his monthly mortgage and other expenses.

32.    Airbnb has become a common vehicle for New York residents to earn

some additional income by renting out parts of their homes for short periods of time.  Upon

information and belief, approximately 40,000 residences (or parts of residences) within the City

are listed on Airbnb for short-term rental.

33.    Mr. Karol decided to list a room on his second floor and his basement on

Airbnb for short-term guests.  Mr. Karol continues to occupy his home while short-term guests

visit.

34.    Given the location of Mr. Karol's home's in the Sunset Park neighborhood

of Brooklyn, many visitors booked the rooms in his house.  The income from these rentals

proved invaluable to Mr. Karol.

35.     The income Mr. Karol earned from listing his home helped him catch up

on past-due bills and stay current on his mortgage.

36.     On or about February 12, 2017, a 311 complaint was made to OSE about

Mr. Karol's use of the Airbnb platform to rent out parts of his home.

37.     OSE responded to the 311 complaint on April 24, 2017—approximately

two and a half months after receiving the complaint was received—by sending inspectors to the

Karol home.

38.     At that point, OSE officers issued Mr. Karol four citations.  All four were

later dismissed because they had been issued in the name of Mr. Karol's mother, who was

deceased.  Upon information and belief, the City made no effort to reissue these citations with

the name of the actual owner.

*The City's Enforcement Offensive Against Airbnb*

39.     In recent years, OSE has stepped up its anti-Airbnb offensive and issued

numerous violations to Airbnb hosts in both multiple dwellings and one- and two-family homes

on the ground that, by permitting short-term guests to stay, the hosts have violated the state

Multiple Dwelling Law and/or "illegally converted" those dwellings to transient occupancy.

Moreover, OSE has issued further violations at such properties for failure to meet heightened

code requirements that it claims apply to the "transient occupancy" use.

40.     For example, between 2015 and the present, the City has cited 193 owners

of one- or two-family homes for not having hotel-style fire-alarm systems—a "violation" which

carries a penalty of up to $2,500.  The City issued no such violations in 2014.  In addition, the

8

pace of such violations has increased every year between 2015 and 2017, and the City is on track to issue 35% more summonses in 2018 than in 2017.

41.    During this period, City officials, including members of City Council, have insisted that they would only target "operators of illegal hotels who put people in unsafe conditions and take affordable homes off the market."

42.    Mayor de Blasio has said that the City's focus on short-term rentals "[is] not with the vision of going after every homeowner who occasionally participates with Airbnb." Mayor de Blasio also has said that the City was not concerned about individual homeowners who "just rent out a room once in a while," and that the City was not "going after every homeowner who occasionally participates with Airbnb."  Other City officials made similar statements.

43.    Despite these promises, owners of one- and two-family homes increasingly found themselves the targets of OSE enforcement actions.  Since 2016, OSE has issued a total of about 1,399 violations for about 257 one- and two-family homes.  The director of OSE, Christian Klossner, has made clear his view that the New York City Administrative Code prohibits virtually any home-sharing of any portion of a one- or two-family dwelling.

***Political and Logistical Support for City Officials from the Hotel Industry***

44.    The City's opposition to Airbnb's home-sharing platform, and OSE's increasingly aggressive enforcement efforts, arise from the strong political and logistical support provided by hotel owners and the union that represents hotel workers, the New York Hotel and Motel Trades Council ("HTC" and collectively with hotel owners, the "Hotel Industry").

45.    The Hotel Industry opposed short-term rentals by Airbnb hosts because it believes that each such rental represents a lost opportunity to rent a hotel room to an out-of-town visitor to New York City.

9

46.    For the past five years, the Hotel Industry has donated hundreds of thousands of dollars to the political campaigns of Mayor de Blasio and members of the New York City Council.  The Hotel Industry has also engaged in independent expenditures on behalf of candidates for city office who oppose Airbnb and support greater restrictions on online platforms that facilitate short-term rentals.

47.    In 2017 alone, the HTC spent nearly half a million dollars—the most among any independent group—on six primary races for City Council seats.

48.    As the City, and by extension OSE, became increasingly beholden to the Hotel Industry, the focus of its campaign shifted from "illegal hotels" and large-scale landlords to true home-sharing—even when done by single or two-family homeowners like Mr. Karol.

49.    In 2014, after receiving nearly a quarter of a million dollars in campaign contributions from the Hotel Industry, the Mayor doubled OSE's budget, prompting it to issue approximately 1,200 citations related to home-sharing that year alone.

50.    The City has invested significant resources into acquiring data analytics tools to smoke out any and all Airbnb users.

51.    In 2015 Elan Parra, then the director of OSE, made formal what had already become a practical reality by stepping down from his post to officially join the Hotel Industry as a high-level employee of a consulting firm hired by HTC.  Upon information and belief, Parra maintained significant contact with OSE employees.

52.    OSE's relationship with the Hotel Industry only deepened after Parra's departure—to the point where the Hotel Industry has been providing investigative and logistical support to the OSE.

53.    According to published accounts, in 2016, Parra's successor at OSE,

Christian Klossner, began expressly asking officials at several Hotel Industry groups to send him Airbnb home-sharing listings to target for investigation.

54.    Soon, OSE began outsourcing the investigations themselves to Hotel Industry groups; by 2017, Parra and others connected to the Hotel Industry were sending self-titled "investigative reports" to OSE officials, according to published accounts.

55.    Upon information and belief, such Hotel Industry-initiated and -led investigations grew ever more aggressive and intrusive, with industry operatives going so far as to rent rooms through fake Airbnb profiles and surreptitiously record hosts.  Investigative reports generated by Hotel Industry operatives include notes from their conversations with hosts, screenshots of text messages with hosts, photos of the apartments, and summaries of video footage and audio recordings.

56.    Hotel Industry operatives have openly admitted to their role in guiding OSE enforcement against average homeowners.   As one stated in a press interview, "[w]e are bringing [OSE], wrapped in a bow, a bunch of leads" and "fighting a bit of a guerilla campaign." Another gleefully celebrated that "[w]e feel that definitely the city and us are cooperating."

***Mr. Karol Speaks Out Against the City's Anti-Airbnb Stance—and Is Promptly Retaliated Against by City Employees***

57.    On June 7, 2018, legislation was introduced in the New York City Council that, if passed, would require Airbnb to submit a monthly report divulging a trove of private information about hosts, including the names, addresses, and contact information of anyone using the platform to rent out any property.

58.    The Council scheduled a public hearing on the proposed bill for June 26, 2018.

59.    Mr. Karol, concerned that the new law would subject him to further harassment by the City, decided to exercise his rights as a citizen and speak out publicly against the legislation.  Mr. Karol publicly advocated against the proposed bill in a number of ways.

60.    On at least one occasion, Mr. Karol distributed fliers against the proposed bill close to City Hall.

61.    Mr. Karol contacted his City Councilmember to express his opposition to the bill and inquire about the timeline for the vote on the bill, including opportunities for public input.

62.    Not long before the hearing took place, Mr. Karol appeared in a television advertisement highlighting the hotel industry's attack on Airbnb hosts and the passing of information to OSE for its targeted enforcement efforts.  (The video is available at https://www.youtube.com/watch?v=BvpUSc1CJ2Q.)  Mr. Karol's participation in the ad was as a citizen; the views expressed were his own, and he was not paid or promised anything for his appearance.

63.    Mr. Karol also appeared at the June 26 public hearing in the City Council. (A video of his testimony is available at https://councilnyc.viebit.com/player.php?hash=r9c28uc F5q5I *at* 2:22:00) and a transcript of his testimony is attached as Exhibit A.)  There, he expressed his opposition to the proposed legislation and stated that, in his view, the only purpose of the proposed bill was to "scare me so I don't do Airbnb."  In the same testimony, Mr. Karol also criticized OSE (and, implicitly, the City's policy vis Airbnb) by describing the incident in April 2017 when OSE issued summonses directed at his Sunset Park home.[1]

---

[1] Mr. Karol was not alone in his view.  At the hearing, Councilmember Jumaane Williams stated that OSE's prior

64.    OSE officials and Hotel Industry operatives were present at the hearing.

65.    Upon information and belief, these officials and operatives, as well as others associated with the City and the Hotel Industry, were aware of Mr. Karol's support for Airbnb and his criticism of the Mayor's policy, the proposed forced disclosure legislation, and OSE's enforcement efforts against Airbnb hosts.  Upon information and belief, these officials and operatives, as well as others associated with the City and the Hotel Industry, identified people at the hearing who spoke out in support of Airbnb in order to retaliate against them.

66.    Just two days after Mr. Karol gave his testimony at the public hearing, on June 28, 2018, the City claimed to receive an "anonymous phone call" reporting Mr. Karol's rental practices as violating the building codes.  Upon information and belief, either no such call actually was received, or the allegedly anonymous reporter was a Hotel Industry operative, a fact known or understood by OSE and the Individual Defendants when they received and reviewed the complaint.

67.    During the public hearing on June 26, 2018, a City Councilmember raised concerns about unreliable or retributive telephone complaints of this sort.  The OSE director insisted that the telephone complaints came from community members who expressed in their report the negative effects of a local Airbnb rental, such as loud parties or trash accumulation.

68.    City records state that the alleged anonymous reporter here mentioned no such negative effects from Mr. Karol's rentals.  The Individual Defendants nonetheless acted on the complaint.

---

promise to leave one- and two-family homes alone was a "lie."  He noted that OSE had continued to shift its position on whether two-family homes using Airbnb would or would not be the subject of enforcement action.

69.    When the City received a complaint about Mr. Karol's home in 2017, it took OSE two and a half months to act on it.

70.    Yet in 2018, when Mr. Karol spoke out against Airbnb, retribution was swift.  Though the City reports it has received over 1,300 complaints this year to date relating to Airbnb rentals, the Individual Defendants went to Mr. Karol's home within *one week* of allegedly receiving a generic complaint about it.

71.    OSE admits that it sets amorphous and unspecified "enforcement priorities," rather than responding equally to all complaints.  OSE has not explained what its current enforcement priorities are.

72.    Upon information and belief, the Individual Defendants were directed to investigate and commence a prompt enforcement action against Plaintiff solely or substantially because of Plaintiff's public statements critical of City policy vis Airbnb, and/or his testimony at the June 26, 2018 public hearing, or to further the intent of the Hotel Industry to retaliate against Mr. Karol for these statements, a fact known to the Individual Defendants.

73.    At approximately 9:00 a.m. on July 5, 2018, as Mr. Karol was preparing for an appointment with City Councilmember Carlos Menchaca about the proposed legislation, the Individual Defendants arrived at Mr. Karol's address.

74.    Upon information and belief, the Individual Defendants were aware of Mr. Karol's testimony before the City Council before they arrived at Mr. Karol's home.

75.    Upon information and belief, the Individual Defendants were all aware that they had been dispatched to Mr. Karol's home in order to retaliate against Mr. Karol for his speech and petitioning activity, including his testimony before the City Council.

76.    The Individual Defendants then attempted to question Mr. Karol about his

14

home.  During the encounter, Mr. Karol stated that he had epilepsy and cautioned the officers that the stress of the encounter could cause a seizure.  When Mr. Karol requested the officers' badge numbers, one officer said in a mocking tone that he would write the badge numbers down so that Mr. Karol wouldn't have a seizure.

77.    When Mr. Karol asked why the officers had arrived to inspect him, the officers simply responded that an anonymous call had been received.  They provided no further information.

78.    Upon information and belief, the Individual Defendants provided no further information because they wished to conceal their retaliatory motives.

79.    The Individual Defendants then posted four summonses on Mr. Karol's door.

80.    The four summonses all charged Mr. Karol with purported short-term rental violations.  The first alleged that Mr. Karol's basement was "illegally converted to transient use."  The second stated that Mr. Karol had failed to provide a fire alarm system for the basement as required for units rented for transient use.  The third charged Mr. Karol with failing to provide automatic sprinklers.  The fourth claimed Mr. Karol had failed to provide sufficient means of egress.

81.    The summonses require Mr. Karol to appear before an administrative law judge on September 10, 2018 at 8:30 am to dispute the citations issued by the Individual Defendants.

82.    All four citations are baseless.  The citations are premised on OSE's recent assertion that all properties used for short-term rental are deemed "transient occupancy" and must be treated identically, whether a multifamily dwelling or a one- or two-family home.

15

83.     Having now claimed that by simply permitting short-term guests to stay in his home Mr. Karol is essentially operating a hotel, the City has insisted that Mr. Karol should comply with Building Code requirements that are otherwise inapplicable to a home primarily occupied as a residence.

84.     In total, Mr. Karol is threatened with up to $32,000 in fines—an amount that is insurmountable for someone of Mr. Karol's means.

***Mr. Karol Fears Loss of His Childhood Home***

85.     The stress of having to defend himself at the September 10, 2018 hearing, coupled with the anxiety over potentially being forced to sell the only home he has ever known, has taken a severe toll on Mr. Karol.

86.     Since being subjected to the Individual Defendants' retaliatory enforcement action, Mr. Karol has not participated in any further flier distribution in support of Airbnb or other short-term rental platforms.

87.     As a result of the Defendants' retaliation, Mr. Karol does not intend to testify further concerning regulation of the short-term rental market, nor has he made any effort to learn about future opportunities for public testimony on such regulation, notwithstanding his desire to express his views on the subject.

88.     Mr. Karol is wary of further participation in public hearings about Airbnb, afraid that he will be further targeted for being a vocal advocate of the short-term rental market.

89.     Although short-term rentals through Airbnb have been a significant source of income for Mr. Karol, he is scared to continue renting out rooms in his home for fear of increased enforcement against him.

90.     The Individual Defendants' unlawful actions in retaliating against those

who participate in hearings on behalf of Airbnb, and all Defendants' actions in arbitrarily and capriciously targeting enforcement against Mr. Karol, have caused Mr. Karol past, present, and future emotional injury.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – First and Fourteenth Amendments
Retaliation
(Against All Individual Defendants)

91.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

92.     At all relevant times, all Individual Defendants were acting under color of state law in their individual and official capacities within the scope of their employment with the City of New York.

93.     Plaintiff engaged in protected First Amendment speech and petitioning activity when he made public statements in an online advertisement and testified at the public hearing on June 26, 2018 as described above.

94.     Two days later after Mr. Karol's appearance before the City Council, on June 28, 2018, an anonymous phone call allegedly sought an investigation of Mr. Karol's home. One week later, on July 5, 2018, OSE inspectors arrived at his home to commence enforcement proceedings—a far cry from the 2.5-month delay between reporting and investigation of Mr. Karol's property just one year prior.

95.     The Individual Defendants' actions in in either fabricating the alleged complaint or responding to the June 28, 2018 call within one week, compared to the 2.5-month delay in its response to the last complaint—though there was no indication in the purported complaints that Mr. Karol was causing negative effects on neighboring properties—were driven

17

by a desire to retaliate against Mr. Karol for his public statements and testimony at the public

hearing on June 26, 2018.

96.     As a result of the Individual Defendants' retaliatory actions, Plaintiff has

declined to engage in further flier distribution or participate in public hearings about the short-

term rental market.

97.     The Individual Defendants' actions have effectively chilled Plaintiff's

exercise of First Amendment rights.

98.     Defendants acted beyond the scope of their authority and jurisdiction to

willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights.

99.     As a direct and proximate result of the Individual Defendants' misconduct

and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

### SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Due Process
(Against All Defendants)

100.    Plaintiff repeats and realleges the above paragraphs as if the same were

fully set forth at length herein.

101.    At all relevant times, Mr. Karol's home was zoned as a two-family home.

Home-sharing was permissible so long as his home was used for permanent occupancy "as a

rule."  Mr. Karol's home was used for permanent occupancy "as a rule," as that phrase has been

interpreted by New York state courts.  As a result, the Individual Defendants had no basis to

issue him any violations.

102.    The Individual Defendants issued him these baseless violations pursuant

to a newly stated City policy of treating virtually any home-sharing as illegal, and in particular

that home-sharing in one- and two-family homes constitutes transient occupancy triggering heightened code requirements.

103.    This policy has no rational reason but is instead motivated by animus against Airbnb and seeks to dissuade homeowners from listing their homes on Airbnb.

104.    The stated purpose of the City's campaign against Airbnb is to find large-scale operators of illegal hotels, not individuals who rent out parts of a home in which they live.

105.    OSE's stated policy of enforcing against one- and two-family homeowners who share their homes ignores the City and State law's different treatment of these entities and is at odds with the City's stated purpose for enforcement activity.

106.    The City, OSE, and the Individual Defendants have acted arbitrarily and capriciously in targeting enforcement against Mr. Karol and treating home-sharing in Mr. Karol's two-family home as transient occupancy, triggering heightened code requirements otherwise inapplicable to residential properties.

107.    Targeting one- and two-family homes like Mr. Karol's bears no rational relation to the stated purposes of the building laws and the City's enforcement priorities.

108.    As a direct and proximate result of the City's policy of treating one- and two-family homes the same as multiple dwellings, Plaintiff sustained the damages hereinbefore alleged.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

   a.    Compensatory damages against all Defendants in an amount to be determined at

         trial;

b.   Punitive damages against all Individual Defendants in an amount to be

determined at trial;

c.   Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.   Such other and further relief as this Court may deem just and proper.


Dated:  New York, New York
          August 13, 2018

EMERY CELLI BRINCKERHOFF &
ABADY LLP


By: _____/s/_____
Andrew G. Celli, Jr.
Debra L. Greenberger
Ashok Chandran
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

**EXHIBIT A**

SKIP KAROL TESTIMONY AT JUNE 26, 2018 CITY COUNCIL HEARING

**Skip Karol:** Thank you for seeing me. My name is Skip Karol. I'm an Airbnb host. I'm also disabled. I have epilepsy and I've had 12 operations. Without Airbnb, I cannot stay in the home that I've grown up in. I've only lived in one home all my life. Last year, while I was at philosophy class, three officers came to my house and they tried to get in. My neighbors told me. They tried to look in my windows, and they left several summonses for me. I had to fight it -- and I got them dismissed. But all I'm asking you to do is write a law that is narrow enough so it's not going to target someone with a two-family house or a one-family house. I'm being put into the same category that people in- that own 100 apartments are being put into, with no regard to what's happening to me. I want to live my life in the only home I know, and that's all I'm asking to happen. That's it.  Thank you.

**Council Member Cornegy:** Thank you Mr. Karol. What borough do you live in?

**Karol:** Brooklyn.

**Cornegy:** So, again, the laws that we've heard today are targeted towards bad actors and those people are removing affordable housing units. It's been my experience that, when enforcement time comes, that's not actually what happens. And again, I'm going to reference the bill that we have before the Council, which would seek to have a special- almost a carve out for one- and two-families from enforcement. So it wasn't- it couldn't have been included in the bill as it was written. So we're hoping that that provides some semblance of support and we will be following it. We- OSE testified to the fact that the majority of their complaints- the majority of their enforcement is generated by complaints filed with 311. We're going to follow that to make sure

that there's not one entity filing those complaints where we find it. So, there are some, you know, some ways that we seek to protect homeowners like- like yourself.

**Karol:** And I appreciate that. But nevertheless I was still targeted. You need- if you need somebody with hands-on experience to help you out with this, all you have to do is ask me - I will help out-

**Cornegy:** I'm going to ask at the end of your testimony for a staff member to come and get your information so we can look further at what transpired. But can you tell me what some of those summonses that you ultimately received were for?

**Karol:** Not having a fire alarm system. Not having a water system--

**Cornegy:** a sprinkler system?

**Karol:** Yes.

**Cornegy:** Thank you.

**Karol:** It's a two-family house.

**Cornegy:** Thank you.

**Cornegy:** Thank you- I'm sorry, and lastly, do you know what triggered the inspection to your house? Did they tell you it was someone had made a complaint?

**Karol:** No, I never I never saw anybody. Like I said, I was away. I was at class that day. They just left it on my front door.

**Cornegy:** OK. So I would be interested how- how the investigation was triggered-

**Karol:** There had to have been a complaint. But I don't know. I- I can't tell you.

**Cornegy:** OK. Thank you.